IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LISA NORDNESS,

                    Plaintiff,                    OPINION AND ORDER

v.                                                        18-cv-357-wmc

ANDREW M. SAUL, Commissioner of
Social Security,

                    Defendant.

Claimant Lisa Nordness seeks judicial review of a final decision of defendant Andrew Saul, the Commissioner of Social Security, under 42 U.S.C. § 405(g), which denied her application for disability and disability insurance benefits. She contends that remand is necessary because Administrative Law Judge Ahavaha Pyrtel ("the ALJ"): (1) improperly weighed the opinions of claimant's treating psychiatrist and licensed therapist; (2) failed to evaluate claimant's obesity appropriately; and (3) adopted an assessment of claimant's symptoms and mental impairments lacking in evidentiary support. The court held oral argument on this case on August 20, 2019, at which counsel for both sides appeared. For the reasons addressed below, the Commissioner's decision will now be affirmed.

BACKGROUND

On November 21, 2014, Nordness filed an application for disability and disability insurance benefits, alleging an onset date of October 25, 2012. (*See* AR 15.) Her application was initially denied on April 8, 2015, and then again on reconsideration on

July 28, 2015. (*Id.*) She then appeared before the ALJ for a hearing on February 14, 2017. (*Id.*)

### A. Hearing Testimony

At her hearing, Nordness testified that she was approximately 5' 7" and 290 pounds. (AR 44.) While she could drive, Nordness explained that she did not drive daily and only drove locally. (AR 45-46.) Even so, her most recent employment had been as a bus driver for the City of Madison Metro. (AR 47.) She testified to having memory and concentration problems. (AR 58-59.) Nordness added that she could "make little decisions," but had assigned her daughter with power of attorney to control her finances and make larger decisions. (AR 59.) She also described physical limitations, including being unable to lift heavy things, limited reach, and an inability to bend over. (AR 57-58.) She also identified balance problems and an inability to kneel or stoop. (AR 58.)

Despite her limitations, Nordness explained that she was taking classes to pursue a degree in human resources. (AR 60.) Since her accident, the Division of Vocational Rehabilitation required her to go to school and take classes. (*Id.*) She also had to retake classes "because [she] flunked." (*Id.*) That said, Nordness had approximately six more classes to take for the degree and had previously been on the dean's list. (AR 61.) She acknowledged taking a hiatus on her classes explaining that "going to school and sitting in a classroom for two hours is very, very hard for [her]." (AR 62.) She further acknowledged taking care of her grandchildren "maybe [a] couple of days a week." (AR 64-65.) Although Nordness emphasized that she was only responsible for caring for the grandkids *after* her

2

granddaughter started crawling, because she was unable to pick her up. (AR 65-66.) She testified that the grandkids had a nanny before that. (AR 66.)

## B. ALJ Decision

The ALJ issued an unfavorable decision on April 18, 2017. (*Id.*) Concluding that Nordness met the insured status requirements through December 31, 2018, the ALJ initially determined that she had not engaged in substantial gainful activity since October 25, 2012. (AR 17.) The ALJ also found that Nordness had a number of severe impairments: degenerative disk and joint disease, depression, and anxiety with features of claustrophobia. (*Id.*) While recognizing that Nordness was obese, the ALJ did not find this to be a severe impairment, as there was "no evidence that the claimant's excessive weight significantly limits her ability to function."[1] (AR 18.) At the same time, disagreeing with the state disability psychological consultants, the ALJ found Nordness's psychological impairments to be severe. (AR 21.) However, the ALJ did not find them to be disabling because she was perceived as having a pleasant demeanor, with appropriate mood and affect, and had reported improvement with Wellbutrin. (*Id.*)

As a result, the ALJ concluded that Nordness had moderate limitations in understanding, remembering, or applying information based on claimant's pursuit of higher education and her reports of difficulty with her memory and concentration, but no difficulty understanding or following instructions. (*Id.*) The ALJ also found that she had moderate limitations in her ability to interact with others based on her alleged difficulties

---

[1] The ALJ also found Nordness's diabetes, hypertension and sleep apnea to be non-severe impairments. (AR 19.) Plaintiff is not challenging these findings on appeal.

3

socializing contrasted with her seeking a degree to work as a human resources manager, that she had never been fired because of an inability to get along with others, and her reports that she regularly ate at restaurants, accompanied a friend to Florida, communicated with others using the computer, shopped weekly, and got along fine with authority figures. (AR 22.)

As to concentration, persistence and pace, the ALJ found Nordness had only mild limitations because of: her two years of college since her alleged onset date; her strong academic performance; and her reports that she could finish what she started, but had trouble concentrating and remembering, and her ability to handle finances. (*Id.*) Her reports that she had trouble with concentration and her memory were related to her pain and medication side effects -- not her mental health. (*Id.*) Finally, as to adapting or managing herself, she had no limitations: she completed two years of college since her alleged onset date and she reported handling stress and changes to her routine well. (AR 22-23.)

Finally, the ALJ concluded that Nordness could perform sedentary work, with specific limitations, including that she could not reach overhead with her left arm, nor could she crouch or crawl. (AR 23.) Claimant was also precluded from working in small, enclosed spaces and was limited to occasional interaction with others. (*Id.*) Ultimately, the ALJ determined that Nordness was not disabled. (AR 32.)[2]

---

[2] Other aspects of the ALJ's decision are addressed in detail below.

OPINION

This court defers to an ALJ's decision to deny benefits unless unsupported by substantial evidence or based on an error of law. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In addition, the ALJ must build an "accurate and logical bridge" between the evidence and the legal conclusion that the claimant is not disabled. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Given these strictures, a reviewing court is not to "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citations omitted). Still, the court must conduct a "critical review of the evidence" before affirming a decision to deny benefits. *McKinzey*, 641 F.3d at 889. Here, plaintiff identifies three flaws in the ALJ's reasoning which, she argues, require remand. For the reasons explained below, the court finds the ALJ has built a sufficient logical bridge between the evidence and her legal conclusions with respect to each.

I. Treatment Providers

Claimant first argues that the ALJ failed to articulate good reasons for rejecting the opinions of Jane Gogan, Ph.D., her treating psychiatrist, and Carla Eichinger, LPC, her treating therapist. (Pl.'s Br. (dkt. #11) 14.) The court will address their opinions in turn.

5

### A. Dr. Jane Gogan

An ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer 'good reasons' for declining to do so." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). Generally, the opinions of a claimant's treating physician are "give[n] more weight" because he or she is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(d)(2) (2011). Even where a treating physician's opinion is not given controlling weight, a number of factors must be considered by the ALJ to determine how much weight to give different medical opinions, including "[l]ength of treatment relationship and the frequency of examination"; "[n]ature and extent of the treating relationship"; supportability; consistency; specialization; and "[o]ther factors . . . which tend to support or contradict the medical opinion." 20 C.F.R. § 404.1527(d) (2011).

Nordness began seeing Dr. Jane Gogan once or twice per month beginning on December 31, 2014, until changing providers because of "scheduling conflicts" on December 8, 2015; she began seeing Gogan again on December 20, 2016. (AR 2926.) On December 26, 2016, Gogan then provided a mental impairment questionnaire. (*See* AR 2925.) When asked for her clinical findings demonstrating the severity of Nordness's signs and symptoms on the questionnaire, Dr. Gogan noted the following: "Appetite disturbance with increase weight change"; "Decreased energy"; "Difficulty thinking or concentrating";

6

"Easy distractibility"; "Feelings of guilt or worthlessness"; "Panic attacks"; "Sleep disturbance / frequent nightmares" and "Persistent restlessness, agitation, anxiety[,] social withdrawal, rumination, [and] poor self-care." (AR 2926)  Dr. Gogan further opined that Nordness was extremely limited in her: activities of daily living; maintaining social functioning; and concentration, persistence or pace.  (AR 2927.)  Gogan also considered Nordness's limitations and symptoms to be "[l]ongstanding -- since childhood" with "[n]o periods of sustained improvement."  (AR 2928.)  As such, Dr. Gogan concluded that Nordness would miss at least four days of work each month.  (AR 2927.)

Ultimately, the ALJ assigned Dr. Gogan's opinion "little weight" because "the limitations Dr. Gogan [found we]re unsupported by the great weight of the evidence, including her own treatment records." (AR 28.)  First, the ALJ noted the glaring disconnect between Dr. Gogan's opinion that the limitations applied "since childhood" and the fact that claimant Nordness had worked full-time for many years, *plus* the fact that she successfully pursued college courses even after the alleged onset date.  (*Id.*)  Second, the ALJ found that Dr. Gogan's opinions as to Nordness's "dramatic limitations are simply not supported by her own records." (*Id.*)  For example, Gogan's own medical records noted that claimant missed appointments because she was too busy with schoolwork, but failed to assess Nordness's situation stressors such as her cervical surgery, her daughter blaming Nordness for her husband's child-abuse investigation, and Nordness serving as temporary guardian for her special needs grandson.  (AR 28-29.)  Third, the ALJ found treatment records from different providers "have consistently demonstrated that the claimant is able to grasp treatment recommendations and education appropriately." (AR 28.)  Fourth, the

7

ALJ found Dr. Gogan's reliance on a possible learning disability to be inconsistent with Nordness's history of academic success and the fact that she did not even allege a learning disability before the Social Security Administration. (*Id.*)

Whether or not this court would have come to the same conclusion, the ALJ's decision to give little weight to Dr. Gogan's opinions is supported by substantial evidence. Although Dr. Gogan was Nordness's treating psychologist and saw her with relative frequency, at least up to one year before being asked to fill out the mental impairment questionnaire, the ALJ appropriately concluded that her opinions of extreme limitations were not supportable in light of substantial, conflicting evidence in the record, including in Dr. Gogan's own medical records. In particular, Gogan's contemporaneous treatment records note that Nordness was studying business and human relations at MATC, where she received good grades. (AR 1798; AR 1834.) Nordness was so enmeshed in her studies that she "totally forgot about [an] appointment," having been "[u]p late doing homework." (AR 1834.) Through her education, Nordness reported being "[m]ore socially connected outside of family now that she is on campus more." (*Id.*) At that time, she also reported that her medications were "helping a lot" and put her "on a more even keel," so that she could "deal[] with stress better." (*Id.*) Those same records also show Nordness continued pursuing her education after becoming her grandson's temporary guardian, although she was "having a difficult time completing assignments." (AR 1702.)

While later in 2015, Nordness reported difficulty attending class after being interviewed by the police regarding her son-in-law, Nordness still expressed "some confidence that she can complete her group projects." (AR 1934-35.) Further, Gogan's

8

treatment notes show that Nordness's daughter was "very dependent on her for childcare." (AR 1934.) Dr. Gogan next noted that Nordness became the "full-time care provider for her granddaughter" in May 2016 and was still "hoping to resume classes in August" at that time. (AR 1966.) Additionally, the bulk of Dr. Grogan's mental status observations were within normal limits. (*See e.g.*, AR 1909, 1915, 1948, 1967.) Finally, and likely most telling for the ALJ, Nordness worked for many years before her alleged onset date, including four years in which she earned over $35,000 (AR 225), substantially undermining Dr. Gogan's conclusion that Nordness's work-preclusive symptoms started in childhood. Accordingly, the court cannot fault the ALJ's decision to give Dr. Gogan's opinions little weight.

### B. Therapist Carla Eichinger

The ALJ also afforded "little weight" to therapist Carla Eichinger's December 2016 assessment. (AR 30.) Eichinger indicated that she started treated Nordness on three occasions beginning in August 2016. (AR 2889.) In her assessment, Eichinger listed the following clinical findings: "Impaired social and emotional functioning," "Impaired concentration," "Difficulties asserting self, [and] interpersonal conflict." (*Id.*) Eichinger identified Nordness's symptoms as "Difficulty thinking or concentrating"; "Easy distractibility"; "Feelings of guilt or worthlessness"; and "Memory impairment -- short, intermediate or long term." (*Id.*) Accordingly, Eichinger opined that Nordness was moderately limited in her activities of daily living and markedly limited in her ability to maintain social functioning, as well as maintain concentration, persistence or pace. (AR 2890.) Eichinger did not know how many days of work each month Nordness would miss

and also did not know whether she was a malingerer. (*Id.*) Finally, Eichinger opined that these symptoms and limitations were first documented on August 4, 2016, just a few months before she saw Nordness for therapy. (AR 2891.)

The ALJ found that Eichinger's opinions of marked difficulties in maintaining social functioning and concentration, persistence or pace were not supported by the evidence. (AR 30.) In so finding, the ALJ relied on Eichinger's own notes taken at Nordness's second appointment, describing her as "fully alert, talkative, and tangential, with just slight disorganization in her speech." (*Id.*) Additionally, the ALJ expressed concern that Eichinger seemed to accept "claimant's subjective reports of losing SSI payments and being unable to pay her bills on face value," while "the evidence establishes that the claimant lost disability benefits she was receiving through her former employer's insurance carrier because she failed to follow through with medical appointments." (*Id.*)

Moreover, Nordness recognizes that as a therapist, Eichinger is not an "acceptable medial source." (Pl.'s Br. (dkt. #11) 16 (citing SSR 06-3p: *Titles II and XCI: Considering Opinions and Other Evidence from Sources who are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by other Governmental and Nongovernmental Agencies*).) While the Social Security Administration can consider opinions from non-acceptable medical sources, such as a therapist, the regulations "do not explicitly address how to consider relevant opinions and other evidence from 'other sources'"; instead, the regulations direct that such sources are to be "evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-

3p.  Regardless, the same factors that apply to acceptable medical sources can be applied to other opinions.  SSR 06-3p.

Here, the ALJ's decision to afford little weight to therapist Eichinger's opinion is also supported by substantial evidence.  First, the treatment relationship was short.  Eichinger began treating Nordness in August 2016, and provided her opinion in December, which Eichinger identifying just three dates of treatment in between.  The administrative record similarly contains few treatment records from Eichinger.  Second, as the ALJ noted, Eichinger appears to accept at face value Nordness's reports of "numerous financial concerns since [losing] SSI," her inability "to budget, pay bills, [or] remember to take medications," and "difficulty cooking and meal planning."  (AR 2010.)  Eichinger also notes that Nordness "lost disability status due to avoiding medical appointments in March and April."  (AR 1987.)  Third, Eichinger apparently bases her opinion of marked limitations on Nordness's self-reported symptoms.  In an assessment following Nordness's first appointment, for example, Eichinger notes that she reported having "[q]uite a bit of difficulty" managing her daily life, tackling her problems, and concentrating, as well as that in the past week she had spent "[a] little of the time" getting along with others in social situations and "[n]one of the time" felt close to another person.  (AR 1988.)  In the notes from her second appointment, Nordness apparently self-reported that in the past month she did not want to be around people, including her friends, was having "[m]uch" trouble concentrating or paying attention, was having "[m]ost trouble remembering things, and often had arguments or physical fights.  (AR 1998.)  Each of these so-called assessments only record Nordness's responses to the questions, without any elaboration or evidence of

11

evaluation by Eichinger. On the other hand, her mental status evaluations are largely normal. (*See* AR 1987, 1995, 2010.)

For all these reasons, the court finds that the ALJ's treatment of the medical opinion evidence from Dr. Grogan and therapist Eichinger is supported by substantial evidence.

## II. Symptoms and Mental Impairments

Next, Nordness complains that the ALJ's assessment of her mental impairments and physical symptoms were not supported by substantial evidence. (Pl.'s Br. (dkt. #11) 17, 23.) Specifically, Nordness challenges the ALJ's determination that she could "occasionally" interact with others and the ALJ's reliance on her activities of daily living to conclude that she could work full-time. (Pl.'s Br. (dkt. #11) 18-19, 23-26.) The ALJ also found that Nordness had moderate limitations in her ability to interact with others. (AR 22.)

As set out in her written decision, the ALJ reached her ultimate conclusions about claimant's ability to interact with others by considering: Nordness's alleged difficulties socializing; her seeking a degree to work as a human resources manager; her having never been fired because of an inability to get along with others; her reports of regularly eating at restaurants; her accompanying a friend to Florida; her communicating with others over the computer; her weekly shopping; and her getting along fine with authority figures. (AR 22.) Nordness's medical records also include notes indicating that she attended a retreat. (*Id.*)

Further, looking at claimant's own reported daily activities, in 2013 and 2014, she engaged in water aerobics, got good grades in school, attempted to regularly exercise, and

12

was able to live alone.  (AR 24.)  In 2015, even though she reported difficulty with vacuuming and yardwork, she also reported being able to shop for household goods, doing laundry, preparing meals, caring for her cats, and loading the dishwasher.  She also swam twice a week and cared for her grandson every afternoon.  In 2016, as previously noted, the record shows that Nordness became the full-time caretake for her granddaughter *and* reported caring for both grandchildren for approximately 12 hours each day.  Understandably, the ALJ found claimant's testimony of significant limitations in her activities of daily living to be "inconsistent with the totality of the evidence."  (AR 25.)  Likewise, the ALJ found no medical support for her claimed need for an assistive device to walk, and she found that Nordness's allegations of chronic pain were not fully corroborated by objective medical evidence.  (AR 25-26.)

While Nordness testified that she did not "like to be around people and interact" (AR 62) and that she had "lost a lot of friends" (AR 60), as already described, there is plenty of other evidence in the record to substantiate the ALJ's finding that she could appropriately interact with others occasionally.  For example, since her alleged onset date, she has been pursuing a degree to work in human resources.  (*See* AR 268-69, 1320, 1627.)  In fact, she was largely successful in her pursuit, despite her testimony that she had flunked a number of classes.  (*See* AR 1834 (in March 2015, she was "[c]ompleting school assignments, getting good grades"); AR 61 (testifying she was on the dean's list and required only six more classes for the degree); AR 1721 (in November 2015, she reported having "some confidence that she can complete her group projects at school").)  Similarly, in a March 2015 adult function report, Nordness described using the "phone and computer

13

to keep in touch with others." (AR 253.) She also accompanied a friend to Florida and went on a retreat. (*See* AR 969, 1909.) Further, Nordness reported having never been fired because of an inability to get along with others and that she got along "fine" with authority figures. (AR 255.) As the ALJ noted, she reported frequently dining out. (AR 593.) Finally, state agency psychologist Esther Lefevre concluded that Nordness had only mild difficulties in maintaining social functioning.

Similarly, the ALJ's reliance on Nordness's activities of daily living to conclude that she could work is no basis for a remand. First, as already discussed, Nordness made significant progress towards a degree in business/human resources management since her alleged onset date. Second, contrary to her hearing testimony, her treatment notes not only show that her grandson lived with her, but she cared for two children up to twelve hours a day and took both children to the doctor. (AR 1892, 1955, 1973.) In fact, she identified "babysitting her daughter's children" -- along with going to classes -- as her main responsibilities in August 2016. (AR 2645.)

In fairness, Nordness also noted that she was limited in other activities of daily living in her March 2015 function report. For example, while she prepared meals daily, Nordness explained that she could not "make food from scratch or big meals," because she could not stand long enough and she also noted her inability to lift heavy pots. (AR 251.) Likewise, while she acknowledged being able to do laundry, she said it took her "several hours." (*Id.*) So, too, she could place the dishes in the dishwasher, but she could not put them away. (*Id.*) And she disclaimed any ability to mop or vacuum or perform lawn work. (AR 251-52.) However, the ALJ took these limitations into consideration in formulating

14

the limitations as reflected in the RFC, which, among other things, limits Nordness to sedentary work and precludes her from overhead reaching with her left arm.

Accordingly, the ALJ's findings as to Nordness's RFC is amply supported in this record.

**III. Obesity**

Finally, Nordness complains that the ALJ failed to appropriately evaluate her obesity, which, if done correctly, "may have led to a more restrictive RFC finding." (Pl.'s Br. (dkt. #11) 22.) This issue was the focus of the parties' oral argument. Specifically, Nordness contends that the ALJ was wrong in rejecting evidence indicating that her obesity was significantly limiting and in failing to evaluate the impact of her obesity on other impairments. (*Id.* at 20-21.) The Commissioner disagrees. (Def.'s Br. (dkt. #15) 14-15.)

While recognizing that Nordness was obese, the ALJ did not find this to be a severe impairment as there was "no evidence that the claimant's excessive weight significantly limits her ability to function." (AR 18.) The ALJ also explained that while obesity "is a risk factor that increases an individual's chances of developing impairments in most body systems," she was unable simply to "make assumptions about the severity or functional effects of obesity combined with other severe impairments." (AR 18-19.) The ALJ further noted that while Nordness "indicated having trouble with daily activities" on August 8, 2016, obesity questionnaire, she also indicated that "these seemed more related to her left shoulder dysfunction than her excessive weight." (AR 20.) Likewise, when encouraged to lose weight to help control her diabetes, she reported that her left shoulder impacted her ability to exercise without reference to her weight. (*Id.*)

Regardless, the ALJ still considered Nordness's obesity during Steps 3 through 5. (*Id.*) As the ALJ noted, Nordness completed an Obesity Questionnaire in August 2016. (*See* AR 367-69.) In response to a question about how her *weight* affected her, Nordness explained that: (1) she could not take baths because she was unable to get out of the tub; (2) she could only eat a "bland diet" because she had trouble swallowing; (3) she only wore "loose clothes and pants w/o elastic"; (4) her grocery shopping was limited due to fatigue and her driving was limited to local driving; (5) she could not do any cleaning or mopping; and (6) she was limited in her cooking due to fatigue. (AR 367.)[3] More specifically, Nordness explained that she: was "unable to walk more than 15 mins without taking a break, especially in hot weather"; could sit, but would fall asleep; could not "stand for more than 20 mins without having to sit"; would be unable to stand up from an armless chair; and could not lift, pull, push, or carry over 10 pounds. (AR 368.) She added that her obesity caused a hip issue that impacted her balance, prevented her from stooping, crouching or climbing. (AR 368-69.) Finally, she explained that she became fatigued easily, needed to nap, found breathing difficult "due to weight," which required "many breaks." (AR 369.)

Given this litany of impacts, the discussion during claimant's oral argument focused on whether the ALJ adequately dealt with claimant's alleged fatigue. In the decision, the ALJ recognized claimant's report that "she was easily fatigued with activity" from her obesity questionnaire (AR 24-25), but claimant claims this is not enough in light of the

---

[3] As for the other limitations she identified, Nordness attributed them to her shoulder injury, not to her obesity. (*See* AR 367 (explaining she could only wash her hair with one hand because her "left arm is not able to rise above head" and she had to dress using only one arm).)

16

uncontradicted evidence that she lays down multiple times a day and the references to fatigue throughout her medical records. However, as the ALJ noted, the only support the court can locate in the administrative record for reports of varying levels of fatigue are from *Nordness* herself.[4] (*See* AR 760 (reporting "no unexplained fatigue" in February 2012); AR 1428 (reporting no fatigue in February 2013); AR 1017-18 (reporting increased fatigue "specifically after eating" in February 2014); AR 1489 (reporting "[p]ersistent or pervasive fatigue" in July 2014).) Accordingly, this record is factually distinguishable from *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003), where the ALJ concluded that there was no medical evidence supporting claimant's right-hand problem, while improperly disregarding the objective medical evidence of that impairment. More broadly, the ALJ rejected claimant's allegations of fatigue in light of her significant other activities, such as babysitting her grandchildren and pursuing higher education.

As to the other alleged limitations identified in Nordness's obesity questionnaire, the evidence is contradictory and again not directly tied to her obesity. First, looking at her claimed difficulty walking and shortness of breath, she has self-reported mixed symptoms and causes since February 2012. (AR 726 (reporting that she got "dizzy if [she] walks far [and] gets out of breath too"); AR 764 (reporting "shortness of breath with exertion walking across a room").) But, at that time she also reported being able to "walk up 2 flights of stairs without difficulty, but if she is carrying something, she would be out of breath[.]" (AR 1207.) Nordness repeated her complaints about shortness of breath,

---

[4] She also identifies drowsiness as one of the side effects from her gabapentin. (AR 256.) At her hearing before the ALJ, Nordness blamed napping after every meal on her diabetes and pain medications. (AR 63.)

including when walking upstairs, again in April 2012, June 2015 and September 2016. (AR 808, 1304, 2674.) Although the reasons for this are less clear, Nordness's daughter also opined that her mother "is not able to walk very long without her hip bothering her." (AR 510.)[5]

Relatedly, throughout most of 2014, Nordness was described as having a normal gait, but in December 2014, she reported walking with a limp for months. (*See* AR 627, 1110, 1504.) In early 2015, she was described as having "[d]ecreased gait speed, decreased B foot clearance essentially dragging feet across floor, patient with heavy weightbearing." (AR 1127; *see also* AR 1132 ("Gait Description: slow speed.").) In October 2015, she was again "ambulatory with a steady gait." (AR 2529.) But then in August 2016, she had "[a]ntalgic right lower extremity, Decreased pelvic rotation, Decreased speed, Decreased stride length right, increase toe out ankle," as well as "Decreased weightbearing on R LE." (AR 2646.) This was described as "severely slowed and antalgic gait." (AR 2648.) Finally, later that month, however, she reported *improvement* in her gait. (AR 2666.) Even so, it was noted that "[s]he continues to be limited due to reduced weight bearing, ankle stiffness, antalgic gait, and lower extremity weakness." (AR 2667.) Again, the record suggests multiple causes for this, not just obesity.

Second, Nordness was repeatedly advised to engage in "moderate exercise daily, ideally 30 minutes or more on most, preferably all days of the week." (*See e.g.*, AR 1828,

---

[5] As an example, while grocery shopping, Nordness's daughter explained that Nordness "will need to sit down 5-6 times for 5 mins each." (*Id.*) To be fair, however, at other times she denied having difficulty breathing or shortness of breath. (*See* AR 1153, 1191, 2732.) In 2014, for example, she reported having to walk a long distance while at school, but complained that it was difficult because of pain. (AR 1160.)

1845.) Over time, her reports of exercise varied. (*See e.g.*, AR 572, 587, 627, 1072, 1164, 1171, 1747, 2646.) In February 2015, her short-term goal was identified as "[r]estart[ing] exercise for weight loss." (AR 1089.) The following month, she reported "doing water aerobics." (AR 1316.) In mid-2015, she reported "doing water aerobics several days per week." (AR 1577.)

Third, it is possible that claimant's condition may have worsened over time. By August 2016, she reported "having trouble keeping up with daily tasks," such as walking and going to the grocery store. She reported being unable to take her grandchildren to the park and consistent dull pain. (AR 2645.) Her symptoms were "consistent with a PT diagnosis of ankle strength deficits." (AR 2648.) However, an independent medical examiner in May 2016 opined that she could squat "without difficulty" and had "normal twisting and bending movements." (AR 1749.) He also concluded that there was "no objective evidence of any specific pathophysiological or structural condition that would physically prohibit standing and walking up to 8 hours a day." (AR 1750.) Finally, when the ALJ asked what prevented her from working, Nordness once again identified her shoulder injury, which limits the use of her left arm, as well as problems getting dizzy from bending over, but did not mention her weight or how it impacted her other physical conditions. (AR 52.)

In sum, the ALJ created a logical bridge, and the court cannot fault the ALJ for her treatment of Nordness's obesity. Accordingly, the final decision of the Commissioner is affirmed.

ORDER

IT IS ORDERED that the decision of defendant Andrew M. Saul, Commissioner of Social Security, denying Lisa A. Nordness's application for disability and disability insurance benefits is AFFIRMED. The clerk's office is directed to enter judgment and close this case.

Entered this 30th day of September, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge